Yeah. Sure, but the board didn't give them that kind of re-procurement cost, so that issue isn't really before us, is it? Yeah. I really fail to see how that can be a breach, though. I mean, if it had turned out that your suits had all tested fine and they had accepted them, and then the Coast Guard had said, well, we already bought these, we're not going to buy your full order, then that might have been a breach, because they were obligated to buy up to 700 from you. But it didn't place a limit on how many they could buy from anybody else. So why is it a breach that they went out and purchased some from another company, even if they're categorized as replacement? Well, it's a matter of timing. They had no right to buy replacement suits. Even the board acknowledged that. Well, the board acknowledged it in the context of a re-procurement request, and certainly because they didn't wait to see if your suits failed or not, then they couldn't get re-procurement costs, because you hadn't defaulted yet. But again, terming them replacement or not, they were legally entitled to go buy suits from somebody else, right? If they wanted to buy additional suits, that was their prerogative. In those terms, I assume that it was not actually a breach at that time, because the government's obligation was merely to pay upon receipt for 777. They didn't breach that. But sometimes a party can repudiate in advance an obligation of performance. What I don't see is how you established that the February purchase of 149 suits from Kokatech was a repudiation of the obligation to pay for 777 if and when they got them. That is, I don't see a record that says there was no way in the world the government was going to buy 926 suits. Well, I see it differently, Your Honor. Where is the evidence that just because they bought 149 suits in February from Kokatech, that they would, if and when you delivered the full 777, say, no thank you, we won't pay for all 777, because we don't need all of them anymore? Well, they claimed in their amended complaint and other pleadings and in the stipulation of facts that these were, in fact, replacement suits. And then they tried to charge USIA for the value of those replacement suits. So the law is clear. You can't go out and buy replacement suits before the termination of the contract. And that's what they did. And even after the termination of the contract, the only benefit that you get is you can expedite. But procedurally, how did this come up in the board? Because it sounds like you're saying that their assertion that these were replacement suits, even though the board rejected it on another issue, automatically establishes that the February purchase from Kokatech was a repudiation that relieved you of your further performance application. Absolutely, Your Honor. If they say they bought them as replacement suits, why can't I take their word for that? So how did procedurally, how was this presented to the board? They put it in their complaint. Then they modified their complaint, did an amended complaint. We put in an affirmative defense that they materially breached. In our answer, they materially breached the contract by purchasing replacement suits. And then the government asked for an opportunity to respond to our affirmative defenses. And they reaffirmed again that they purchased replacement suits but claimed that they were entitled to do it because we didn't have a requirements contract. And that's totally irrelevant because we had a fixed price contract with 770 suits in under Stone Forest and similar cases. They can't just take away the 423 suits. Where in the record, besides this description of these as replacement suits, does it ever suggest that the Coast Guard wouldn't have bought all of the ones that it contracted for you with if they proved satisfactory? Well, there isn't anything there. My problem is that by describing them as replacement suits and trying to get re-procurement costs, which the board found was improper, you're saying that evidence is their intent not to fulfill their order with you. But I don't see anything that suggests that the Coast Guard said, we're not going to fulfill our contract with you. By virtue of saying they're replacement suits, that's saying it right there. I mean, they're the ones that said they're replacement suits. They repeatedly said it. Tried to charge USIA for those costs. The board said that's improper. But only after the contract was defaulted, right? Not during the performance of your contract when they were doing the testing on all the suits. They never evidenced any intent not to go through with your contract until your goods didn't fulfill the testing requirements. Well, that's true. They didn't tell us about it until the suit was filed. And they filed the appeal file, and we found out about that. So, you know, that's our point. There was no waiver. Let me ask you this a different way. If your suits had fulfilled the testing requirements, and the Coast Guard went ahead and purchased all 700 and some that they'd ordered from you, would their other purchase from the other company constitute a breach? Well, if they wound up paying USIA, of course not. But they had already determined that they were replacement suits. Okay. I mean, they're the ones that claimed it. Can I switch topics before your opening argument time elapses? Sure. You complained that the testing that was done, particularly the July testing by the Navy, did not comply with certain conditions on what you described as proper testing. What specific conditions were not met in that testing, and what was the source of those conditions? In particular, why were they contractual obligations? Okay. I spell them out in the brief, but the primary source is the maintenance procedure that's called out in the contract. I understand that the maintenance procedure is part of the contract. What condition in the maintenance procedure was not followed in the testing? Okay. The maintenance procedure says there's a leak if there is a soaked spot or if there are soaked socks. They did not follow that procedure. They used a less stringent standard. It says to put it under garments. During the trial, that was indicated that that was the same thing as in the Rescue and Survival Systems Manual, which is the polypropylene first layer and the fleece second layer. Now, the fleece second layer sheds water. It doesn't absorb water. Instead, they used a 65% cotton, which absorbs water. Cotton also spreads the water. Therefore, it appears to be wetter than it is. It is supposed to be soaked, not just damp or anything like that. Then they also wore wristwatches. I think I understand, actually, the facts that you identify as being problematic. What I am unclear about is precisely which ones of those facts come from which sources and why those particular sources are part of the contractual obligation as opposed to the user's manual or something else that may or may not be part of the contractual obligation for how they have to determine whether the goods are defective. Okay. The wristwatches are mentioned in the user manual, which both parties agreed would be used. Both parties agreed would be used. I'm not sure what that means. That their testing contractually must follow user manual instructions in order to decide whether something is defective? The user manual was not incorporated into the contract. Why is it relevant? Because any user manual, if you buy any item, you're supposed to comply with the user manual. The government agreed that they had to comply with the user manual. In fact, they did. So the government agreed that testing out of compliance with the user's manual would be a contract violation? Yes. Do you happen to have a cite for that? Well, CWO Shea pointed out, I asked him if he complied with the user's manual and he said absolutely. Jerry Langen told the contracting officer that they needed to comply with the user manual and he said they did. There was agreement on that. The rescue and survival systems manual, that is an overarching manual that also includes the wristwatches, the different types of undergarments that you're supposed to wear. The important thing here too is that regardless of what the source is, if you wear cotton, it's going to absorb water. If you're wearing fleece, which is a synthetic wool, it's not going to. And the cotton is going to look like it's wet, even though it may be just a little bit damp. Whereas the fleece would shed the water, would just get little balls of water and that's it. So you are into your rebuttal time? I'm well into it. So why don't we give the government a chance to argue and we'll hear from you afterwards. Thank you. May it please the court. On the question of the purchases from third parties of the additional suits, there's no evidence in the record that that was done to preclude purchases from USIA. What did the government mean when, or what did you mean when you asserted as a claim these were replacement suits? How does that not mean that the 149 we bought from Kokatak were going to be subtracted from what we were going to buy from USIA? First of all, there is the testimony at trial from the contracting officer at A32 of the appendix, it's transcript 32 to 33, where he testifies that they were hoping that the suits would pass the immersion test so that they could purchase them. In terms of the legal defense that was being raised at the board, there was a warranty provision and the argument was made that there was a breach of the warranty provision by providing suits that did not pass the immersion test. I'm not saying that this is a good argument or that the government is continuing to make that argument. I'm not understanding how what you just said is responsive to my question. I take it that you said, we terminate the contract because your goods are defective. They say, we didn't any longer after February, after the government bought 149 suits from Kokatak, have any performance obligation anymore. The reason we didn't is that that was, in fact, by the government, a repudiation of its contractual obligation to buy 777 suits, if and when they were delivered in non-defective form. Why is that argument wrong either as a matter of law or unsupported by the evidence, consisting of the government's own assertion that it bought 149 suits from Kokatak in February to replace what it was going to buy from USIA? The government still had a need to purchase additional suits as the contracting officer testified at trial. Where is that? As I said, it's at A32, transcript pages 32 to 33. It's appendix 32. I'm sorry, that testimony says that the government was prepared to buy 926 suits. It doesn't go into numbers, Your Honor, but it does say that they were hoping that they would pass so that they could purchase the suits. There was still a need to purchase suits. Also, there's testimony from the government witnesses at the trial that the reason the purchases were made was because there was training that had to be conducted and they needed suits at that time for that training. That doesn't take away from the need to get additional suits under the USIA contract. I'm not sure exactly what you mean by additional. Suppose that the government was going to need 777 suits for the next five years. It had a contract to buy 777 suits from USIA. It didn't say everything we needed. It wasn't a requirements contract, but suppose it were clear that once it bought 149 from somebody else, it absolutely had no need to buy 777 anymore. Their purchase of 20 percent or something from somebody else meant, as sure as could be meant, that they were not going to fulfill their obligation to pay for 777 suits from USIA. Why would that not be a repudiation? Does the record, in fact, support all the assumptions that I just built in? No, the record doesn't support it. I'm not disputing that there could be a repudiation in such a case as hypothetical as the court is outlining. What I'm pointing out here is the contracting officer specifically testified that there was still a need to purchase these suits. They were hoping that they would pass the immersion test. In fact, the government, the Coast Guard, paid the Navy thousands of dollars to conduct this immersion test with the anticipation that if they had passed, then they could have gone ahead and purchased suits for the government's needs. I cited you to the appendix page 32. And which of the four mini-pages is the testimony that you were referring to? It's transcript page 32 to 33. This is the line that says, it seemed like, and we actually hoped that the product would work. That's it? Yes, yes. And there's also testimony... That doesn't necessarily mean anything other than it was perfectly happy to... It was hoping that USIA would end up supplying 777 minus 149. I said it didn't go to numbers. Right, but that's the whole question. The whole question is whether having bought 20% of the number in the USIA contract from somebody else, that meant you were absolutely not going to buy that number from USIA. And you called them replacement suits. It was done in litigation. In litigation, the assertion was made that it was a replacement suit. And as I said, there was a warranty provision, and the government was making an argument under the warranty provision at that time, that there was a breach of warranty. I'm not saying that that's a good argument. We're not making that argument today. But that's the argument that was made below. And I would point out that the board did find a lack of jurisdiction on the question of whether the government could recover any monies for reprocurement costs. The board did distinguish between the different purchases. There were some purchases made prior to the termination for default, and then there was a purchase made after the termination for default.  The board indicated that that possibly might support a reprocurement claim, but not the other purchases. Did USIA make a repudiation defense to your termination for cause claim? They phrased it as a breach of the duty of good faith and fair dealing. I didn't see specifically mention of repudiation. I read it as a breach of the duty of good faith and fair dealing. I think that's what certainly their main thrust is. I didn't read their papers as saying repudiation. The second issue that was raised today has to do with the testing itself, and the court asked, well, which documents are part of the contract? It is the maintenance procedure that is part of the contract. That was an attachment. It was incorporated into the contract. It's in the appendix at multiple times, for example, at pages 127 to 30. The other two documents are separate documents. One is the user manual, and that, as USIA agrees, was not part of the contract. The other document is the rescue and survival manual. That also was not part of the contract. There's nothing in the contract that purports to incorporate the rescue and survival manual. Is it the rescue manual that says the water should be cold? It's the user manual. The user manual. And Mr. Billings, I think when he was standing up here, suggested that the government agreed that the testing had to be under the contract, had to be in accordance with the user manual. That's not supported. What actually happened is there were several rounds of testing, as the court would recall. There are two rounds of testing in January, and then the round of testing in July by the Navy. This has to do with the rounds of testing that were done by the Coast Guard itself. First, three suits were tested. They didn't pass. Then there was a more extensive testing in January. Those suits didn't pass. And it was Mr. Shea of the Coast Guard who testified with regard to the testing that was done in January. In his testimony, he explains that there's the three suits, then the more extensive testing, and then another round of more extensive testing. During the first round of more extensive testing of the suits, they're not all wearing polyester. It's in the final round in January where some of the test subjects wear polyester. What about July? Was everything in the user manual or the maintenance procedure followed in the July testing? Yes. Including the user manual? No. Not the user manual? No. The user manual is the one that requires cold temperatures, requires cotton undergarments, and what I would point out- Non-cotton. Excuse me? Non-cotton. Correct. Correct. Actually, two layers, polyester and then a fleece on top. What I wanted to point out about Mr. Shea's testimony was Mr. Shea of the Coast Guard testified that it's only when you're actually in cold water that you have to wear the polyester undergarments. You don't have to wear polyester when you're doing the testing itself. That's what he testified to. As I said, during some of the testing by the Coast Guard, they did use polyester, not fleece on top, but they used polyester. It's that testimony that I think USIA is relying upon. What about USIA's focus on the word soaked? If you look at the report for the Navy testing, the Navy testing in most of the cases states that they are wet from the waist down. This is confirmed in the video where the undergarments are padded by Mr. Lawson. He pats the undergarments and he states that they are wet from the waist down. These are soaked. They are wet from the waist down. In many cases, eight of the post-cure suits are documented in the report as being wet from the waist down. There is one that is wet with the legs and the feet. As Mr. Lawson testified, the amount of wetness is something more than anyone could sweat. These are soaked from the waist down. I point to his testimony. It's appendix page 96. That would be transcript 286 to 87. This is specifically mentioned by the board. The board cites his testimony and credits his testimony with stating that the amount of wetness is more than anyone could sweat. Finally, as was testified, at the hearing there is a safety issue here. We can't have Coast Guard members out there in dry suits that leak. Can I ask you a question about one sentence in the contract that I didn't quite understand? I'm looking at appendix page A119 at the very, very top. This is the last sentence of clause E6, the non-acceptance of items. There is a sentence that says, repair shall not be a cure for items that are not accepted. What does that mean and how does that fit with what I guess I was assuming, which is that you agreed that they did have some right to cure defects? I'm not sure anything turns on it, but since all of this seemed to be about a multi-month seemingly agreed upon opportunity to cure the initial problem and an ultimate conclusion that they had not cured the problem, I wasn't sure what to make of a sentence that said, repair shall not be a cure for items that are not accepted. I'm not sure that it has application in the circumstances of this case. What we're concerned about here is suits that leak. They fail an immersion test, and it was stated specifically that they had to pass an immersion test. And further, if they leak, that they fail the immersion test. So I'm not sure that that has an application in the circumstances of this case. Accordingly, here USIA provided the government with suits that leaked. This included the post-cure suits that were tested by the Navy, and as shown in the test results, Mr. Lawson's testimony, and in the video, these suits did in fact leak. And there's been no showing by USIA that the cause of the leakage was due to the government's action. So it wouldn't fit under the FAR clause for excusable delay. The court has concluded, Your Honor. Thank you. Two minutes. Appreciate that. Your Honor, one point. It wasn't the breach of good faith and fair dealing with regard to the replacement suits. It was a pure breach of contract. That's what we argued. Asserted as a breach, not as a repudiation. That's correct. But it wasn't under the concept of good faith and fair dealing. Just a pure breach. With regard to cold water. And I'm sorry, procedurally, you made that as a defense? Affirmative defense, because the complaint was filed by the government. And then was that issue tried? Yes. It was tried? Yes, Your Honor. Okay. And I don't remember, so just remind me. The board said what about that affirmative defense? What the board said was that they had a footnote. And it just said they considered all other arguments. And that was included in the other arguments. And they disagreed. No merit to it. So that's all we have. It's in a footnote. With regard to the cold water issue, that is not in the user manual. It's in the rescue and survival systems manual on page A101 of the joint appendix. The user manual does call out the survival systems manual with regard to undergarments. Both the user manual and the survival systems manual does say you're not supposed to wear wrist watches, things like that. But even if you didn't use those as a basis, it's common sense that you wouldn't use those because those could rip the seals. The same thing, even if you don't use the user manual and the rescue and survival systems manual, say you don't wear cotton, the testimony of the government witnesses was that, yes, cotton will absorb moisture. And that could include perspiration at high temperatures that this was tested at and would mar the results. I think your time is up. I've got 19 seconds. No, that's going in the wrong direction. Oh, I'm sorry. That's okay. Thank you for your argument. Thank you. The question is submitted.